Okay Mr. Gotti. Thank you. We have a lot of materials. Good morning. Good morning your honors. A lot of cases tonight. Yeah seven cases and we appreciate your time. It's a lot of materials. Good morning, your honors. May it please the court, as we were just saying, as there are seven cases consolidated here. We have a lot of issues, but I wanted to make four points that kind of relate to a lot of them. First, we do have controlling Fifth Circuit precedent here on the notice and comment issue, and that would be the wages on bond decision that you authored, your honor. Secondly, contrary to what FDA has argued in this case, it is not doing floral adjudications here of these applications when it applies the comparative efficacy standard that I think you are familiar with. Third, as a result, and this goes to the APA and Altra Beer's argument, is that they missed some key information here, and that's their own information. They have extensive survey data of middle school students and high school students over the span of a half decade that shows minors are not using these products, and that is really important to the application of the comparative efficacy test. And finally, the final point, just briefly, is that FDA argues that the Supreme Court's decision in the wages case just helps decide these issues, and so we pointed out that no, it doesn't decide, it doesn't control on any of the issues that are before the court today. Well, the in-bank court will have to be deciding what to do with that case. Yes, in fact, I think they just finished briefing. Yeah, exactly. So I can go back to start with the first point, which is the notice and comment. There are kind of two prongs here. There's the TCA argument that it actually has a provision in there requiring notice and comment for anything that's governing flavors, that it's a TTA prong, kind of a notice and comment. And so here, as your footnote, Your Honor, pointed out, is that we have this categorical ban. We still have that with regard to non-menthol flavored products, and that has resulted in the facto ban. And I think as you said, the FDA has unquestionably violated that requirement in the Tobacco Control Act, which requires notice and comment, and to give an opportunity for all stakeholders, including manufacturers, to have a say in that ban. And so what FDA, and so your on-bond decision would control on non-menthol flavored products, and we would argue it also controls on the menthol flavored products, even though six have been approved, it's the same rationale. And it's only six, a very small portion of that part of the market. Just a minute to the wages case. I would assume that you would agree that we should withhold any decision here until the In-Bank Court has decided what to do with the wages case, whether to decide it as an In-Bank Court or something. I don't mean to suggest what it might do, but there's been no decision on that, wouldn't it? How could this panel move ahead without that decision? Because I think this case involves different issues. So that was the harmless air issue, and we don't have that here. So the reason why it was remanded is because in the wages case, FDA didn't consider the marketing and access restrictions. So the Supreme Court thought that was important. And so then the harmless air issue came up, so that's why it's been remanded. And we don't have it here because FDA did look at the marketing and access restrictions. So you're saying don't wait? Don't wait. So on the second issue, and I think this is a really important point, because it kind of informs our analysis on a lot of different issues. The APPH standard is relative, and you had a hypo in your decision that got to this. You can't know, FDA can't know, how much weight to give to one piece of evidence. Unless it looks at all the other evidence. It's APPH, it's the balance, and it's all relative. And in fact, the Supreme Court, and I think it was the EPA, said that that word appropriate is a signal from Congress, saying you have to consider everything that's relevant here. But that's not what FDA is doing. 1.2 million times for non-tobacco flavored products. All it has done is opened up the application and asked, is there a comparative efficacy study? Whatever form that takes. If the answer is no, you get an MDO. That is it. They are not complying with the statute here. If you look at the statute itself, it says you have to consider the information that's submitted, as well as any information FDA has on that product. And that's very important for the NYTS data that I've talked about, the kids' surveys. And then it goes on to talk about APPH. So FDA cannot comply with the TCA unless it does a full balancing and weighing. And so you can see that distinction in the tobacco flavor versus non-tobacco. They don't apply the comparative efficacy test to tobacco, because they're assuming that kids aren't using those products. What happens if you have an application that is for non-tobacco and kids aren't using that product? They wouldn't know because they're not looking. They're not asking that question. So this informs, first of all, the notice and comment issue. This is a standard. They are applying it across the board, hard and fast, no exceptions. They aren't doing case-by-case adjudications. They aren't taking what we are saying is a standard and opening up the application and saying, is this standard appropriate here? Should we apply? For example, are kids using these products? If the answer is no, maybe you don't apply the comparative efficacy standard. Or maybe you tweak it. That's not what they're doing. They've never done that, as far as we know. And so that means this is a standard, which applies to flavors. It's resulted in a categorical ban. And we certainly don't agree with their characterization, but they are doing flexible case-by-case adjudication here. And they make a decision on each application. That is not the case. So, if you go to the APA page, that was notice and comment. If you go to APA, so remember, the statute says that they have to consider all information that they have about that particular product. Every year, they survey around 20,000 middle school and high school students. In fact, many of us took the same survey when we were kids. And they asked which of these products are not usable. Not a single one over a half decade. There's one of, I should clarify, six of the seven manufacturers. One, the kids did identify that product. But for six, they didn't, over the span of, I think we usually gave you three years worth of data for each one. And no kids are using that. Remember that the comparative efficacy test applies. And the Supreme Court said this in wages. It applies because you have a substantial risk to kids. But all of a sudden, in our cases, and they wouldn't know because they didn't look, we don't have a substantial risk. So that raises the question, why are we applying the comparative efficacy test? Why aren't we tweaking it for these applications? The answer is they didn't look. They have that information. It's part of the administrative record. The statute says that. Why aren't they looking at this data? So at a minimum, I'm not saying we win because of the data. I'm saying that under the APA, they had a responsibility to look at it. And they had a responsibility to explain to us, you, and all of our stakeholders, how they dealt with it. Maybe they just brushed it aside, but they have to tell us why. Why isn't it relevant? Mr. Gotting, I understand your challenge on flavors. Are you also arguing on behalf of menthol? Or is that, are we just going to hear menthol from the amicus? No, no, no. We have menthol. We have 55 of menthol manufactured. So can you help me understand? I'm not sure I've read all of the TPL. They're obviously voluminous, the TPL reports. But I've read several of them. And I'm focused in particular on the two, I think the first two, menthol approved. So the Juul and the Enjoy TPL records. So those are in the FDA's database. They've obviously approved those. I don't think they're going to take them away. So why doesn't every menthol manufacturer file a one-page application that says, we know we got an MDO last time, but now you've got six TPLs, six whatever you call it, the opposite of an MDO. We're going to do that. We rely on that with all of it. I believe these are the same technical data for the nicotine content and all the stuff that's in our little vials or whatever. But the marketing restrictions and the access points and that we're not going to hire social media influencers and all of that stuff, wouldn't that be approved in like five minutes? No. I know the answer has to be no because there's millions of dollars at stake here, but I don't understand why. Yeah, these take forever. But couldn't you write it like you just rely on everything that you approved? Yeah, we could. And depending on this court rules, we might send that into the petition, citizen petition. But to be consistent with the argument I'm making here, the fact that they've approved other menthol should be relevant. That should be part of any analysis that they do on a menthol product. And it should get us down the road. But what I am arguing, and to be consistent with my argument, they still have to look at all the evidence. They do. Every application. Because if not, then they're doing something else. And so I would still say that FDA, even if they get that petition first, say, hey, you approved these menthol. Why don't you approve them all? They still have to review, under the statute, everything because of the APPA standard. But what would be the non-arbitrary, non-capricious justification for rejecting a menthol PMTA after you have six approved ones? Right. So what is not happening here is they're not putting the menthol products into what we call full scientific review. All they're doing is applying the standard. Once they get into scientific review, and you probably haven't seen these memos, but it is extremely detailed. You have multiple juror specialties, the toxicologists, the engineers who look at the device, everything. And they write these reports. And so FDA, in our experience, will find any reason, just even a little reason, to not grant authorization. So I can't sit here and say, because you've approved one menthol, you should approve all. It may be a long way down the road. And FDA recently has been saying that kids aren't using menthol like they thought they were. So that's great for us. But again, I think you have to do the case-by-case evaluation. And it's detailed. But is the idea that APPH inquiry, product by product, is going to be different for the – I don't remember if Niquid has a menthol product or not, but, you know, a paper piece. It does. Then it wouldn't be for Enjoy and Joule? And how could it be? I mean, kids are either using menthol or they're not, right? There's a switching problem or there isn't. And those are market surveys you referenced earlier. We all took them in high school or whatever. And so that would apply to Niquid or Vapor Breeze or Enjoy or Joule. Right. Right? So the quality of the applications differ. And we are under an obligation to show that it's APPH, and that's more than just kids. Kids is driving this. And I would agree with you. If kids aren't using menthol, then we're 90% of the way there. Because if they're not using this, that means our marketing and access restrictions are working. At least it's evidence of it. And they have to explain to us why it isn't evidence of it. They never do that. So I agree with you. If kids aren't using a product, if kids don't like menthol, we are a long way towards getting approval. But I have to say, consistent with my argument, that they still have to look at everything, and there may be something they don't like. Maybe the device is dangerous. That would be an example. But isn't the reason that you got MDOs for your clients on these menthol ones that you didn't include the comparative assessment? And so I guess the most fundamental, more formal question is, why does that matter? If they have comparative studies on menthol and kids and whatever, because when I read the details for Enjoy and Joule, that's what they're seizing on. So those are now in the FDA database.  You wouldn't have to submit another one. FDA's position is that every single, it's not every single product, it's every version of a product, we have to submit evidence on. That's what I was trying to understand. It is, the bar is so high. And that's, I guess, not a decision for you or me. It's Congress, but it is for FDA. The bar is extremely high. So if you have a 3% nicotine blueberry flavor, and then a 5% nicotine blueberry flavor, you have to submit data on both of those. So that's why it's not as easy. That's what I was looking for. Sorry for the extended. No, no, no, no problem. So we have, I'm happy to answer any other questions, but notice common APA, we do have some more specific issues. So one is the zero nicotine issue. So the definition of a tobacco product is it contains nicotine. And it can be from either tobacco or it can be from synthetic. And so what FDA told us back in 2016 is that it is going to do a case-by-case assessment of all the evidence that's in the PMTA to decide whether or not there's an intent or a reasonable expectation that someone is going to take that zero nicotine product, which isn't covered. That's not regulated by the Tobacco Control Act because it doesn't have nicotine. And nicotine in it. Nicotine would be the product. And so what they say they did is they took our zero nicotine product, and we have five clients who have these on the market. And they assumed, they didn't do the case-by-case analysis. There's no discussion in the record whatsoever of zero nicotine. They did an analysis. Excuse me, they didn't do any analysis. They only did it in their briefs. There was supposed to be a case-by-case analysis. But what they did instead is they assumed, of course someone is going to mix nicotine into it. That's an assumption that they told us they weren't going to make. They said they were going to do case-by-case. There is no evidence that we're advertising this to be mixed, that we gave people instructions on how to mix. You don't just use a dropper. Mixing nicotine can be very complicated. There's no evidence that our customers are doing this. And we offered a range of nicotines, e-liquids, in vapor. We actually explained in a cover letter, one of our clients, that the reason you do that is so that smokers can step out. And they can get to zero. That's the way they wean themselves off their nicotine addiction. So we have a lot of post-hoc rationalization and argument from FDA in their brief. And they say, well, why did you submit these products if there's zero nicotine? And the reason is because FDA told us in the deeming rule that they were going to do a case-by-case evaluation. So either we risk an enforcement action, or we give them the chance to do that jurisdictional analysis and decide whether or not these are tobacco products that are subject to the TCA. So by submitting the applications, we weren't conceding anything. We were just following what they, you know, they wanted to do the jurisdictional analysis with letting them do it. So I think I'm almost, I have only five minutes left, and I want to introduce a rebuttal. No, you get the additional five minutes for rebuttal. Okay. Oh, so I got it, got it, got it. So you're okay. Do you have any other questions regarding any of the other issues? I don't want to take up your time unless you have the brief. All right. You've saved time for rebuttal. Okay. Thank you. Thank you. Mr. Vergonis. Thank you. Good morning, Your Honor. I probably missed and asked your name. You got it perfectly right. Judge said it. Thank you. Christopher Vergonis for Amicus RJR Babar. I will address the FDA's failure to subject the comparative efficacy requirement to notice and comment rulemaking, which violated both the TCA, because it's a tobacco product standard, and the APA, because the requirement is not the product of genuine case-by-case adjudication. With respect to the TCA, tobacco product standard, the Supreme Court reiterated in wages, notwithstanding Chenery 2 and the agency's general ability to proceed via adjudication, the agency must use rulemaking rather than adjudication if the statute says so. And here, the statute says that FDA shall use rulemaking procedures for the establishment of any tobacco product standard. That's a point in your footnote 5 of your opinion in wages, Judge Oldman, for the NBAN Court. Comparative efficacy is a tobacco product standard, and that's true whether it's viewed as a de facto ban on flavors or as a performance standard. Dictionaries define standard as a level of quality, achievement, performance, et cetera, that is considered acceptable. That's Merriam-Webster's definition. That's exactly what the comparative efficacy standard requires here. It needs a product-specific showing. That goes to your question, Judge Oldman, about why applicants can't just rely on what NJ did. It needs a product-specific showing, the applicant's product, how it performs the tobacco flavor comparator in terms of getting users to switch to e-cigarettes from smoking or to significantly reduce. So it's a bright-line standard. It falls comfortably within the dictionary definition. Ordinary English usage, the Supreme Court wasn't interpreting the word standard, but it twice in the wages opinion referred to comparative efficacy as a standard. That's at page 924 in the Supreme Court report of the Supreme Court's wages decision. The statutes, in giving examples of what FDA can do for product standards, lists properties of the product, characteristics of the product, measurement of characteristics. So those are all standards. And for a good analogy, I'd point the Court to the discussion of emission standards by Justice Scalia in the Supreme Court's engine manufacturers case. Pivoting to the APA issue, even apart from the tobacco product standard issue, FDA violated the APA by adopting the substantive rule without notice and comment rulemaking that the panel held in the RGRB statement. FDA claims that it proceeded via adjudication, but as this Court explained in City of Arlington versus FCC, the Court must look behind the agency's characterization to determine whether or not the action is genuinely the result of case-by-case adjudication. And there are two authorities I would direct the Court to that illustrate this principle in action. The Sixth Circuit's opinion in Brown-Corman, that was the subject of last month's Rule 28J letters, illustrates a very recent application of this principle where the Sixth Circuit said this rule that the agency is applying wasn't derived from case-by-case adjudication of particular facts, and it wasn't created to resolve the particular dispute at issue. And more pertinent, because it's binding on this Court, is this Court's decision in Shell Offshore from 2001, when Judge Higginbottom actually joined that opinion of the Court in 2001. And the Court there, it involved adjudication of an application similar to this. And the Court there looked at the agency's internal memorandum, and it held that the agency engaged in rulemaking because the policy was the basis for the adjudication, rather than the facts of the particular adjudication causing the agency to adopt that policy. That's a quote from that case. And in other words, again, quoting from Shell Offshore, the agency established the policy first, and then applied that policy in several applications. And that's exactly what FDA did here, and I think it's most vividly illustrated by FDA's internal mental memorandum, which are at the NICWID appendix, pages 142 to 149. Those memos show a top-down process where the new director of the CTP came in and told the adjudicators what we're going to do. And the titles of those memos are not application-specific. They're general. Process for evaluating menthol-flavored ends, P&TAs. Development of the approach for menthol-flavored ends, P&TAs. In the memos, they talk about resolving foundational questions, all based on general consideration, not specific to any one applicant. And the critical line- I just want to make sure I understand one. I want to make sure you've got a chance to get your argument out before your time expires. And I hope the presiding judge will let you answer this question. Can you help me understand the timeline? Because so much of this is internal. FDA makes a lot in their brief of the fact that you're relying on stuff that you know now and which you didn't know then. So can you give me the most vivid illustration of what you knew before you submitted the P&TA for menthol products versus when you found out that there was a different standard with MDO? So nobody knew anything about these standards, the comparative efficacy standard, before the deadline for submitting applications for on-market products, which was September of 2020. So that's the same as it was in wages. That's the same as it was in wages. There was a deadline to get the benefit of FDA enforcement discretion, because in wages, as your Honor has discussed, there was this. These products were on the market before they became covered. So FDA said, meet this deadline. You can continue to sell. So there were hints in the discussion about this surprise, which the Supreme Court disagreed with this court about what FDA had to tell it. No one knew about the comparative efficacy for flavors or for menthol products. Then, before deciding the first flavor products, FDA, in the fatal flaw memorandum, explained that it's going to apply the comparative efficacy approach, and then applied it to the flavor products, rejected them all. Then for menthol, a year later, the new director comes in and says, we're going to apply the same approach to the menthol products. Decided that before deciding the first application. So it's not case by case. And then rejects the menthol products, but then does allow a couple of menthol products that did have that information in the application. Facts are on all fours with Shell offshore. Thank you, Your Honor. All right. Thank you. Mr. Soder? Good morning. May it please the Court. Kevin Soder from the Department of Justice for the government. I think it might be helpful to briefly just take a step back. The case is a challenge from petitioners to FDA orders that deny authorization to market products in flavors that are common kid-friendly flavors, such as strawberry crumble, pineapple lemon, cherry, apple cider, fried ice cream, and menthol. Congress itself decided through the Tobacco Control Act that there would be what I think is fairly characterized as a categorical ban. All new tobacco products that were not already on the market as of a particular date in 2007 are banned unless the manufacturer of that product can show to FDA that it is appropriate to grant a product-specific application to permit the marketing of that product. FDA is required then under that statute to deny the product-specific application if any of four conditions are satisfied. The first one is the one that the FDA relied on here, as it did in wages in the other cases that are before this Court, which is that the applicant has failed to make an affirmative showing that the marketing of the product would be appropriate for the protection of public health. Now, I think the Supreme Court's decision in wages is quite helpful in addressing many of the issues that are before the Court. I'm happy to focus the questioning wherever is the most helpful to the Court, but I think much of the discussion so far has been about the notice of comment issue, and so I'm happy to start there. I think wages tells you that what you want to do to resolve this issue, given that these are individual adjudications. I don't think anyone could dispute that an FDA order denying marketing authorization to a specific product is an individual adjudication of essentially a license for the government's benefit of permission to market that product in interstate commerce. And so in conducting that case-by-case adjudication, wages says, well, the only way there would be a notice of comment violation is if there was a statute that requires the agency to engage in rulemaking before doing that sort of case-by-case adjudication. And here, there isn't. The tobacco product standard statute that's cited sort of in passing in that footnote that we've been talking about isn't such a statute, and I'm happy to talk more about why that is and what that statute actually does. Yeah, can we walk through it a little bit? Because I'm not sure. I've tried very hard to understand your position in the brief, but maybe if we do it in dialogue, I'll get it better. So I'm looking at subsection G. And so you're quite right. So A1, this is 387G, subsection A, has special rule for cigarettes as a general prohibition on the flavors. That all makes sense to me. But then, subsection A3 says the Secretary may adopt a tobacco product standard in addition to those in paragraph 1, which is the flavor bans and whatever, if it finds that the tobacco product standard is appropriate for the protection of public health. So why is that not a general requirement that determinations of rules that are appropriate for protection of public health, the APTH standard, go through notice of comment? I think because, I mean, there's several reasons. I would start with the word may in A3a. That the Secretary may prescribe this sort of rule. As you noted, there are two that Congress set forth in the statute. There actually aren't any that FDA has promulgated for a final rule. There are three that FDA has proposed that have never become final rules. And when you look for the rest of the statute, I think you can see that all of those, both the pre-proposed ones and the two that Congress put in the statute, share some features that are absent here. Before we do the features, let's do the may first. So the may is obviously adjudicated. It's not modifying, you may go through notice of comment. No. It's saying you may issue a tobacco product standard that would then go through notice of comment. But why is the comparative efficacy requirement not a tobacco product standard? I'm hung up on it. So as Your Honor noted, when you look through, there's a TPL review. It's kind of a key document for understanding FDA's decisions in each of these cases. And when you look through it, FDA can explain, starting from the statutory standard of appropriate prevention of public health, how that standard hashes out onto the facts of each particular application. It so happens that FDA received a large number of applications that share a very important feature, which is that they include flavoring other than tobacco. And so that's why when you look through these roughly 30-page decisions, you see a lot of discussion of what FDA has found based on the current scientific literature in general is true of flavor products. And I think there are several things, just to get kind of more of a scientific angle of things, but it might be helpful to back up and talk about what, I think, three factual findings based on current scientific evidence FDA has made and why it decided to do that through adjudication rather than putting it in stone. I think the three things that are key, and if you look in the NICUID one, just since that's the first case here, the CPL review, you can look at pages 18 to 32, I think, spell out a lot of this. 32? Yeah, of the NICUID evidence. So the first question FDA looks at is how much risk does non-tobacco flavoring add for use? And there is robust evidence, and the Supreme Court reaffirmed there's robust evidence that the answer is quite a bit, and that that risk is consistent across flavors. And so, for example, what FDA saw and what it describes happening in the real world is that when certain flavored products were taken off the market through enforcement action, other flavored products sort of rose in attendance in popularity among youth. And I think what that tells you is that flavoring is what the kids are following. So that's on the risk side of the sort of risk-benefit analysis in the statute. Can we go one by one, just so that we don't get confused? I want to make sure you get them all out. So one is how much risk does non-tobacco flavoring add for use? Right. And so my question is, is there anything that any manufacturer in the United States, because I totally take your point, and obviously the Supreme Court's reading on this. There's abundant evidence that Blueberry Crumble or whatever, Strawberry Parfait, has risk to use. So is there anything that a manufacturer could bring on this first factor? We'll get to the others, I promise. That would say, no, no, no. Our Strawberry Daiquiri does not have a risk to use, notwithstanding the mountain of evidence and the million MDOs that FDA has issued to other flavors. The answer has to be no, I can't. I think FDA hasn't seen it yet, but it's doing this for adjudication. And it's considering the evidence in each case. And I think I was thinking of this more as perhaps a second piece of what I was thinking of, which is, is there any way to mitigate that risk to use? And what FDA has said is traditional measures, like not focusing your social media presence on kids, are not mitigating the risk to use from the flavors initially. FDA has noted that it's sort of more of an open question whether something like a device access restriction could mitigate the risk to use. This would be something like, if you have to use your face ID or fingerprint or something to access the device, and you could limit it to adults that way. But there's sort of, I mean, the statute, stepping back, calls for this risk-benefit assessment. And those are the two key pieces of the risk, I think. Adding non-tobacco flavoring adds a lot of risk to use. And manufacturers in these specific cases haven't shown a way of meaningfully mitigating that risk. And the case-specific challenges that are before you here are just sort of saying things that the Supreme Court has already recognized is FDA can extrapolate from this data to time, for example, that there are currently 41 authorized e-cigarette products. If the 42nd product were a petitioner's fried ice cream product, I think FDA has reasonably identified a concern that kids may flock to that product even if they haven't been using this specific brand to date. Sure. OK. So that's the risk side of the cancellation is there. On the benefit side, this is where I think the focus on comparing across tobacco products comes into play, which the Supreme Court explained was at the core of this statute. Because what FDA has explained in each of these PPL reviews, and this is in the NCCWA appendix at pages 24 to 29, is that the question is, is there a proven benefit to essentially current smokers in terms of switching or reducing their use of combustible cigarettes to these products? And what FDA has explained is that to date, the general scientific literature does not support a benefit of flavors compared to tobacco. And so where that leaves you is that the flavored e-cigarettes and the tobacco-flavored e-cigarettes, in general, have the same potential benefits to adults in terms of helping them switch off of harmful cigarettes. But the flavors are adding risk to kids. And so that's why FDA has structured its review process to focus on, can this particular manufacturer show something for this particular product that differs from that general scientific literature that doesn't show a consistent, robust benefit of the flavor versus the tobacco? Can you help me understand the MDOs for the six menthols and the MDOs for all of the others? Yeah. So the six menthol products that you were discussing are the Juul and the Enjoy products. And as you noted, those orders and rationales are available publicly. And you cited them in the brief. And what those say is, I'm quoting from the one in Enjoy here, that Enjoy was able to show, quote, a robust and reliable evidence that the menthol-flavored product is associated with statistically significant and substantially higher rates of complete switching than their tobacco-flavored products. In other words, they're showing something like if you could design a perfect world where you take two groups of 100 adults who are current smokers, give one group the tobacco-flavored Enjoy products and the menthol-flavored products and give them a choice between those two and give the other group only the tobacco-flavored products, they didn't present this quite type of study. But the basic idea would be, if you can show that that first group that has access to menthol is actually switching off of smoking more than that second group, then you have shown an added benefit of the menthol flavoring. But the denominator is what the reports call CC, the combustible cigarette. Yeah. And so the basic idea is, obviously, this market is currently flooded with unauthorized products. I think FDA is rightly considering, can we get to a situation where we're only really dealing with authorized products? And if we could get to a situation where the market only had the option of tobacco-flavored products because those appealed to you less, is there an added benefit to supplementing the market with a flavored product? So far, the answer has been no for the menthol products in this case, no for the fried ice cream products in this case, but yes for the menthol products. So can we do that? Let's talk about the TPL for Enjoy, since it's the one you referenced. So in the TPL, it refers to the specification of this product, including to the percentage of the menthol. So it's 5% menthol. It has very specific product PM codes, which I'm not exactly sure what those mean. But it seems to be down to some relative level of granularity that this particular menthol-flavored Enjoy product has this survey data. Is the FDA's position that a new menthol ends maker can't rely on this study to get their menthol ends approved? I think the rationale that FDA has given across these cases explains why the evidence needs to be product-specific. So I wouldn't say that someone couldn't cite that and say, look, you've approved these menthol products. I think that shows that it's possible to meet the statutory standard as applied to the facts that FDA has found. The thing that hasn't changed and that potentially could change for future adjudication is this general risk-benefit literature that causes FDA to basically say the benefits are in equipoise between tobacco-flavored and other flavors in general, but the risks are much higher for the non-tobacco-flavored fruit. So that's why it analyzes it this way. And in these cases, FDA explained, I think there's a helpful footnote in the PPL. So if I could go on this. And the Niquid one is in the appendix for Niquid at page 26 of the appendix. And it's footnote 23, testing my ability to check little Roman numerals. And what it says is that there's a discrepancy in the literature for youth initiation and adult switching, which likely reflects fundamental differences in the two outcomes being assessed, youth initiation and switching among adult smokers and their determinants. For the switching among adult smokers, the behavior change is occurring in the context of nicotine dependence. Thus, the specific product's ability to provide adequate reinforcement and continue to satisfy a smoker's cravings over time, which is a function of the design of the specific product itself, are critical factors in determining cravings over time. In determining likelihood of continued use and the product's ability to promote switching. By contrast, youth initiation and experimentation among naive or novice users is not driven by these factors. In other words, that is why it makes sense to focus on, OK, has NJOY or Juul shown that this specific product is satisfying the cravings of nicotine users? Perhaps it's people who smoke traditional flavored cigarettes. Perhaps it's people who are already smoking menthol-flavored cigarettes. But are they being satisfied in a way that causes them to switch over more than they would if the only product on the market were the tobacco-flavored products of which FDA has also authorized quite a number? So I just want to be very clear about this. Because when we talk about tobacco, I want to be clear on what the denominator is. So the denominator, we talked earlier, is the CC product. It's the cigarettes. But then you keep talking about tobacco-flavored products. So do they have to show, are they comparing to tobacco-flavored products that are already on the market, and that's the switching, to be ADPH? Or is it that, no, I'm going to stop smoking Marlboro Reds or whatever? I think it would be whatever comparison will help show that the statutory standard is met. And I think that's another reason why these really are case-by-case. A lot of this flows from what benefit are these manufacturers asserting that they can provide? And what they are asserting is that we can help people who smoke combustible cigarettes. I don't know if it would have to be brand-specific or something like that, but we can help them switch to a less harmful alternative that has no tar in it and has fewer harmful chemicals in it. But these six PPLs, the approved menthols, I should be very clear. I'm trying to focus for a minute on menthols and not cookie crumble or whatever. Those all say that the relevant switching is between combustible cigarettes and this very specific, down to the tenth of a decimal point, formulations for menthol. I think those are the products for which they were applying. And they have shown that they gave these products to people and people switched more off of combustible cigarettes to those specific products. And the reason why is that we were discussing that the evidence has to be product-specific because, as FDA said in the PPL in these cases, the general literature doesn't establish that flavor differentiation promotes switching and that applies to menthol just as much as the other flavors. Can we zoom out for a second? And I'm curious more about just an administrative law question that you have. I realize we're talking a lot about the granular detail in this case. I can't think of another example in administrative law where an administrative agency comes up with a rule. I mean, it's clearly a rule. I'm not trying to be argumentative. I'm not meaning it in the EPA sense. But call it a standard. But it's clearly a rule. You have to show X, this is the data that we're requiring you to show, without telling the manufacturers ahead of time. And then saying, well, no, we just did it in 1.2 million cases, but we're doing it case by case. We're looking for one specific piece of evidence that you don't have. Six times you do have it, so we're going to approve those. 1.2 million times you don't have it, so we're going to deny all of those. And then say that's not a rule. I've never seen it before. Obviously, we see licensing cases all the time. We see EPA cases all the time. I'm not sure I can think of another context in which there is this much volume of a request for a license of a product where Congress has said the product is not legal to market unless you can come forward and make an affirmative showing that you have a statutory benefit. And so that's where I think I get back to. That sort of mode of analysis, it reflects an application of the statute to the fact as FDA currently finds them, some of which are true in the general literature, some of which are true in this specific application. I totally hear you. And I'm not trying to disagree with you. I'm genuinely trying to understand the government's position on this. I hear you that we're trying to figure out what is ATPH. I totally get it. But the statute says nothing about comparative efficacy studies. The statute says nothing about this particular product versus combustible cigarettes. The only comparison provision that you point to, which I think is in G or is in J, says you have to compare it to other tobacco products. But it doesn't say anything about comparative efficacy, the risk-benefit, the mitigation, fingerprints on these devices. So I'm giving you, I'm trying to give you, for the sake of discussion, these are all ATPH. You might be totally right. We should be more worried about the kids and the fingerprints and the whatever. I'm just trying to understand how it could be that they learn about it in mass, a million incident MDOs, and they have no chance to cure? I can't think of another example, I'm sure, of where that happens. So a few points on that. I'd like to talk about the specifics of the statute and then what the Supreme Court says about the statute. So on the specifics of the statute, the statute does require an order that's specific to the product. And it also requires that FDA deny the order if there's a failure to make this appropriate for the protection of the public health show. One of the other grounds for denial that I think is helpful to keep in context of how the statute all fits together is if the Secretary determines that one of these tobacco product standards, such as if there were a standard saying slavery is banned, FDA just offered a notice of prominence and decided, you know what? Literature hasn't changed. We're fixing it in time. Slavery is banned. That's a separate ground for denial. But instead, FDA has taken on the work of doing this in a case-by-case way. So just point by point, I'm sorry to interrupt this. Let me try to get it all. If FDA decided that a flavor, that literature is solidified for good, at least for now, across the board, banned, that is a rule, and it does go through a notice of prominence. If FDA decides to do it by a tobacco product standard, that's something that the statute offers. But that is sort of a parallel track of an additional approach that the statute offers. In other words, FDA, I think, has a sort of, it's optional two times over whether to use a tobacco product standard. First, whether to issue the regulation, because it says may. And second, whether to rely on that regulation or whether to just do the sort of holistic analysis. I think Judge Rao explained how these fit together quite well, in her opinion, for the D.C. Circuit in the FONSIM case that we cited in our brief. What the court wrote there was that if FDA had established regulatory standards, then it could do not have applications that fall short of the standards without undertaking an individualized public health balancing for each product. But you could do it the way the NLRB does it, right? Like the NLRB just says, in a case, A versus B, we hereby hold that cookie crumble and everything like it is not APPH. It's all denied. And then, in all of the subsequent TPL, you wouldn't even need a TPL. You could just do an MDO. And it says, as we told you in A versus B, this is our rule. I'm assuming you're making a Chenery point. You get to choose which way you want to do it. And in adjudication, you could just decide we're going to ban flavors. I think that's certainly possible. And one thing that helps make this case easier, I think, is that that isn't actually what FDA has done. FDA has gone through and explained its analysis in each case. But yes, I do think that Chenery 2 and Valero states have the implication that in a circumstance like this, when you are adjudicating something that involves a particular fact between people, and I think no one can dispute here that every single one of these orders is directly affecting the manufacturer there, that can serve as precedent. FDA has chosen to re-articulate all of the reasons each time. And so you have before you all of the reasons that apply to particular facts of these cases. And I think to the sort of Valero state point, I think that the Supreme Court decision has some helpful language that explains, that maps on quite well to why FDA chose to do, take the approach that it did here, which is that there can be ample indication that adjudication is especially appropriate when there's reason to proceed with caution, developing standards in a case-by-case manner, and doing so in cases where those most immediately affected are parties. Here, that's the manufacturer. It's welcome to say, you're totally wrong about this scientific literature. And if FDA acts in an arbitrary and capricious way in overlooking something that's material to the actual bottom-line results of the public health standard, then that's something that this court can review. And why would it be true, suppose that, I don't know, Vapor Breeze has a 5% menthol in its product. Why would that product not be APPH when the Enjoy product is? And let's just assume that you don't have any toxicology. All of the marketing stuff is the same. It's a 5% menthol product. Either way. I think the statute puts a burden on the applicant to show that their particular product is appropriate for the protection of the public health. And when, as in these cases, the only things that the applicants are able to point to are these cross-sectional surveys that don't show changes over time, and many of them don't talk about the specific products. At issue, you don't have the kind of affirmative evidence that's needed to overcome that significant risk to use that the flavors pose. I mean, what we're talking about here, backing up, right, is that FDA is acknowledging and is open to the possibility that even though these products pose a very serious risk of youth getting addicted to nicotine, they're still entertaining the possibility that it can be appropriate for the protection of the public health if there is enough benefit to adults on the other side of the ledger. And I think it's... Given that the literature hasn't shown that that benefit is true as a general matter, in applying the statute, the Secretary shall deny if there's not evidence. But there's a real tension, isn't there, between saying on the one hand, look, there's a ton of literature here that FDA is going to rely on, in particular with cookie crumble and everything else, but also with menthol, about switching adults. So we're relying on general literature over here to issue NVOs. But when it comes to issuing a market granting order, then it has to be in the application itself. And it's on your... And by the way, we realize that we never told you what the rules were ahead of time, but it's your burden to come up with your own study. You can't rely on Enjoy or Juul. Like, there's an asymmetry that I'm having difficulty with because I would think that if you want the benefit of relying on all of the stuff in your massive databases and all of the experts and everything else, they should be able to come in and say, we would like the benefit of the stuff that Enjoy did and Juul did, and apply those same reasons to us. Here's our 5% menthol product. We'll market it the same way. Please give us our order. FDA is applying a consistent mode of analysis in all of these cases. And what I think you'll see when you look at those is that FDA made the same recognition in those orders for the six products that were granted, that there remains no general scientific literature consensus that adding any flavor, including menthol, is going to provide an added benefit to adults. Those manufacturers were able to make a showing that these manufacturers couldn't. And I think going back to sort of the where did they get the notice from question, I think the Supreme Court's first point on this is quite telling in its decision in wages. They start with the statute. And the court explained, in addition to the criticism that Your Honor was talking about, the provision in 317JC4 says that FDA has to make this appropriate for potential public health analysis with respect to the risks and benefits to the population as a whole. Taking into account the increased or decreased likelihood that existing users of tobacco products will stop using such products, and the increased or decreased likelihood that those who do not use will start using. And essentially here, Enjoy and Juul were able to show that there was an increased likelihood that existing smokers would actually switch to their products. And these manufacturers were not able to make that showing. And then Enjoy and Juul want to change those. They want to change the shape or size or the capacity or there's all kinds of stuff in here, the shelf life of the products. They have to do a new DMCA, right? I believe so. The statute says that the Secretary asked that they need an order that's specific to their product under the statute because Congress decided whether, I think the wisdom of Congress's choice is not before this court, but Congress decided essentially to freeze the tobacco market where it found it, when it enacted the statute, saying actually it reached back from 2009 when it enacted the statute to 2007 and said, if you are marketing a product which was not on the market at that time, you need to come and get a product-specific order from FDA. Is that true if they changed the color of the pen from black to green or maybe that could appeal to kids or something? I would suspect so. I don't want to make a recommendation here because I'm not actually familiar with the details of exactly what it is. But I agree that the product is a quite specific thing and I would expect that for the risk and benefit calculation to be quite detailed. The issue here is that all of these products share this problem of the flavoring is really what adds to the risk to use without evidence that it also added to benefit to adults. And I think on the tobacco product standard piece of this, I did want to make sure to just sort of identify what actually falls within that statute. The statute calls for FDA that chooses to create one of these standards for the two that Congress set out in the statute. They all concern the construction components, ingredients, additives, constituents, and property of the tobacco product itself. And that's why it would be something that FDA could use this authority if it wanted to say, for example, as it did in a proposal that hasn't been enacted, no menthol in any product, including the ones that don't meet pre-market tobacco authorization. So this is something that I think the statute generally is saying, we're going to set a standard across the market, whether it's something that you need to come to us for permission to market or whether it's something that's already on the market. And it's going to concern the ingredients, additives, constituents of the product. In the context where the statute requires FDA to do a case-by-case adjudication, as back to that quantum decision from the D.C. Circuit, says there's this choice between either taking on the task of doing something that addresses the specific facts at issue in the case and survives arbitrary and preposterous review, which I think we're happy to talk about why the case-specific challenges here fail. FDA can make that choice. And then the question is just, did it apply the statute in a way that it applies with the FDA? Another point I just wanted to make sure to emphasize that we haven't talked about yet about the notice and comment issue is I think there's sort of a fundamental mismatch here between the nature of the claim that the petitioners are raising and the sort of relief that one would normally get in a successful notice and comment claim. And what I mean by that is normally you would say, OK, there is this document out there that didn't go through notice and comment but is having the effect of a rule. And what we would like, as people who are just aware of this document out in the world and expect ourselves to be affected by it, is we would like that document to be set aside or vacated. What you have here, though, is a document that is unquestionably the product of an adjudication, a specific order on an application. And in that context, what you would look for in terms of a remedy for a notice and comment issue is if there's some other document out in the world that's not actually an adjudication, that was improperly relied upon, such that you should send the case back to the agency with an instruction to disregard this procedurally impermissible but perhaps substantively found other document out in the world. But in here, Why is the fatal flaw memo not that doc? I mean, I know you drew it. But if the agency issues the fatal flaw memo, just I realize this is not your position, but just go with me for a second. Fatal flaw memo, oh, gosh. I totally shouldn't have done that. Withdraw it. And then issue 1.2 million MDOs that are consistent with it. Why wouldn't it be a valid APA challenge to say, hey, listen, just assume that the fatal flaw memo needed to go through notice and comment. You would agree with me, I would think, that that would then be set aside and we'd have an order that says you can't rely on that anymore. You can't do the stuff that's in that memo. I think you would then get into, I mean, you could think of it as a harmless error analysis, right? Where you have the subsequent document that is self-contained and explains itself and comports with the statute and the APA. I think you have to ask yourself, did this other document out there impermissibly affect it? And when the answer, as here, is no, I think you have a harmless error problem. Now, of course, that's not the situation here. And I think the Supreme Court specifically said that it was accepting FDA's representation that the so-called fatal flaw memo had not, in fact, been relied upon in any of these adjudications. And I think the court's discussion of the presumption of regularity that supported the agencies in that passage of wages is also quite helpful here in recognizing that FDA is here showing you that we have this long reasoned product of adjudication that's specific to the particular application. FDA is here telling you that this is an application of the statutory provision that says look to the general public health balancing, not look to some tobacco product standard. And the Supreme Court has said that the balancing between the statute calls out for various types of comparisons, including comparisons among different tobacco products, whether one's already on the market, like the tobacco flavors and cigarettes that are now available, or other potential new products. And the Supreme Court further says, in a sentence that I think is all but dispositive here, that FDA was not required to issue any sort of pre-application guidance in the first place. And FDA has the discretion to work out the meaning of the statutory standard when evaluating free market tobacco applications. In other words, FDA is given by the statute the authority and the discretion to determine there is a fundamental problem that affects this large volume of applications that we've seen all at once. I think another way to potentially think about it that could be helpful is imagine that tomorrow someone comes to FDA and says, I have a new e-cigarette product. It has some ingredient that has never existed in a product before. FDA tests it and determines that that product is poisonous and will provide added risk with no benefit to any person. FDA explains its decision in an adjudication, saying we're not issuing an order that can't be appropriate for the protection of public health based on the presence of that product. If the next day FDA gets a second application, and it has the same ingredient, it's going to repeat its analysis ostensibly and do the same thing. That's just an agency treating like cases alike. And if we didn't have that, we'd be facing a different type of challenge, because someone would be here saying, you're treating my case differently from the way these other cases are being treated. If a third case comes along, and a fourth case comes along, and a fifth case comes along, I don't think there's a point in there where you can just suddenly say that the thing being done has converted into a rule rather than an adjudication. It's just applying the consistent reasoning of those previous adjudications and determining that no material facts have changed. And that's why here, FDA's analysis is contingent on the material facts in the world that are discussed throughout these TPLs, about the general level of risk to use, and what the general literature says about benefits to adults from products. I totally take the point. I think it's an interesting hypothetical. But the logic of it is that you never have to issue a tobacco product standard through notice and comment. It was sort of interesting. If each decision stands up to the, do you apply the, was this product appropriate for protection of public health? And the answer was no, and you didn't have an intentional eye on a tobacco product standard that was optional to promulgate in the first place. Yes, I think that's where the logic leads. Again, I don't think the court has to fight off quite that much. Yeah, but it's interesting. We started this whole conversation. I very much appreciate the back and forth. It's been very helpful to me. But we started the entire conversation with subsection 3 and the may and what's modifying. I guess we come back to actually inverting the answer. So it's not that you have an obligation to do tobacco product standards through notice and comment. It's that you may, as long as you're consistent, just apply the same rule in each adjudication, which you probably should, right? Don't want to be arbitrary. Right. And if it's tantamount to a new standard, you really never have to go through notice and comment unless, through underchenery, the secretary determines that that's a good idea. I think that may well be the implication. And when you read these provisions together, I think you will see there's only one reference to the tobacco product standard statute in the statute that requires FDA to adjudicate this. And it's that it's one of the four independent grounds on which the FDA could deny such an application. But when it relies on this other ground, I think you are just reviewing, did it apply that other ground in a way that survives arbitrary prejudice review? The other thing I just wanted to make sure to note reflects the Seventh Circuit's Griffin case in our brief and the Eleventh Circuit's Bitty Vapor case in our brief. I think both of those are entirely consistent with what we're saying here. And I don't see how you could issue a decision saying notice and comment was required here without creating a circuit split with those. As well as, there's a case called Liquid Labs from the Third Circuit, which I think was cited in some of the decisions, but not actually in the briefs itself. So apologies for that. But that's another case that says, I think, quite correctly, that straightforwardly, once you realize that there is no new secret heightened standard, which is the issue that the Supreme Court has resolved in wages, it follows that there's no notice and comment problem. So Mr. Gotting tells us that we should have no reason to wait to see what the in-bank court does in the wages case. What is the government's position on that? I think, of course, if the court issues a presidential decision on some point of law that would affect this case, we'll address that when it happens. There are a few issues that have been briefed in wages that would sort of, I think, inform whether that happens. One is there was some threshold briefing about whether the case should be decided by a panel or by the en banc court. And so to the extent the court agrees with the government that the case is properly before a panel, I defer to the court on how it sequences who gets to decide the case first. But then also when you look at the government that submitted its brief on that case already, I believe there are five briefs due tomorrow. As the government claims, in our view, many of these issues are forfeited either because of the posture of the case in which the Supreme Court set it back only for the harmless error marketing plan issue that the petitioners chose then not to raise or argue with on remand once FDA reconsidered, and because one of the key arguments for a tobacco product standard point is not actually raised by the petitioners themselves. In that case, it's only raised by an analyst. So is the answer yes or no? The answer is every lawyer's favorite answer. It depends on what the court does with wages. I think we're, you know, if the court is going to issue... Well, no, but the point is we don't know, and I don't mean to suggest one way or the other what the in-bank court is going to do in wages, but we have a panel here of three judges, and when all of you are finished, I'll say that the case is submitted. So it's submitted and ready to be either decided or placed on hold. So the government should be in a position to tell us whether we should go ahead and issue an opinion tomorrow or a month from now or a week from now or whatever, or whether we should wait on the in-bank court to see what happens in the wages case. I think we defer to the court on that. There are some overlapping issues, particularly the notice and comment issue that is before this panel. It's also before a panel in which Your Honor heard argument a few months ago in a case called BDX, and it's also been briefed in the wages case, but as I know, there's a threshold forfeiture issue there. So I think it's sort of... We defer to the court on how it sequences these and which things that... I mean, yeah, all of the issues have been presented and discussed today, and certainly the court could decide them here. All right, thank you. Mr. Schiller? Mr. Gotti? Thank you. Mr. Revolos? Thank you. Just quickly, we have no evidence. They adopted through adjudication a comparative efficacy test. All we have is a press release. And frankly, the press release didn't really explain the comparative efficacy test. They did it in 55,000 cases. You pointed out the NLRB. We don't have a decision like you would before the Labor Relations Board that is issued, and then everyone has a chance to see it. And it's proof that FDA did, in fact, do an adjudication. It looked at all the facts, and it said, you know what? It's appropriate here to develop a rule, and we're going to put it in our opinion, and everyone's going to know about it. So they never did that. We don't know if they did adjudication. Go to the second step, when they apply it. I'm going to say this again. They are not applying this in a full adjudication in compliance with the TCA. It's a simple checkbox thing. Way to look at it, comparative efficacy does not equal APPH. They have to do so much more. I want to point out, and we pointed this out in our brief, they say multiple times in their TPLs, each one, actually, as the risk goes down to kids, so does the burden on showing benefits. With your back and forth with Mr. Soder, he spent a ton of time talking about added benefits. But as the risk to kids goes down, which we have evidence of in this case, because kids are not using these products, that's what their surveys say, our burden goes down. And now the question is, is comparative efficacy even relevant here? It's not required by the statute. It can be. The Supreme Court held that. But it is not required. And as that risk goes down, we know they don't apply comparative efficacy. They don't apply it to tobacco products. They've never applied it to any other tobacco product. It is only flavored, non-tobacco flavored products. And so the added benefit here, I'm saying it's irrelevant. And of course, all of their research on kids is relevant. But when you have evidence on the other side, substantial evidence, they have to take account for that. And they have to explain why it is irrelevant. And they didn't do that. I want to make another point on the G3 and G4. The point regarding the tobacco product standards is that, yes, they have discretion when to do tobacco products and et cetera. But once they go down that route, they have to do notice and comment. And that is plain from the language of the statute. And they went down this route. They are applying the standard across the board. They aren't doing case-by-case adjudications. And so once they do that, they've got to do notice and comment. I think right at the end, there was a point that was made that they did the adjudication. We're not arguing that that's not a general rule. But we've made two points here. One is that they're not doing an adjudication. They didn't develop an adjudication. There's no sign of that. And they're not applying it as an adjudication. But secondly, there is the abuse of discretion. Even if this court were to find, you know what? They can do this adjudication. It hasn't been a problem. They violate the rule of marginal utility. And that comes from the Bell Aerospace. Marginal utility, as you know, is it's usually appropriate to do adjudication when you have kind of a smaller issue that's not a huge deal. It's flexible. You can apply it case-by-case. And it doesn't apply to a lot of people. Here, and I know it's not a hard and fast rule, but that's the dust. Here, it's completely the opposite. We have a really important issue. This is important to the manufacturers. This is important to people who use these products to quit smoking. It is not flexible at all. It's been applied across the board as a hard and fast rule, as a binding standard 1.2 million times, including in the cases where the six menthol were approved. And finally, it obviously applies to a lot of people. So even if they get to adjudicate here, and that's what they've been doing, and I'm not sure the Supreme Court did not address that issue. It did not say they were doing full adjudications here. They just addressed the change in position, that even if they were doing adjudication here, it is an abuse of discretion. See, my time is up. Thank you, Mr. Chairman. The case is under submission. Last case for today, Kutchow versus Wood.